UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MILAS ISAM STROZIER, JR. | ) | CASE NO. 4:13CV1993 |
| | ) | |
| Plaintiff | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | **MEMORANDUM AND OPINION** |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Milas Isam Strozier, Jr.'s Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his August 20, 2012 decision in finding that Plaintiff was not disabled because Plaintiff's impairment did not meet or medically equal a Listing (Tr. 12). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

**I.    PROCEDURAL HISTORY**

Plaintiff, Milas Isam Strozier, Jr., filed his application for DIB and SSI on October 27, 2010, alleging he became disabled on February 27, 2009 (Tr. 10, 12, 187-93, 212-217). Plaintiff's application was denied initially and on reconsideration (Tr. 65-126, 131-46, 152-65). Plaintiff requested a hearing before an ALJ, and, on July 19, 2012, a hearing was held where Plaintiff appeared

1

with counsel and testified before an ALJ, and Robert E. Breslen, a vocational expert, also testified by telephone (Tr. 25-58).

On August 20, 2012, the ALJ issued his decision, finding Plaintiff not to be disabled (Tr. 10-24). Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 1-4). Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Sections 405(g) and 1383(c)(3).

## II. STATEMENT OF FACTS

Plaintiff was born on March 12, 1961, which made him fifty-one years old when the ALJ denied his request for DIB and SSI (Tr. 10-24). Plaintiff has a tenth-grade education and past work experience as an industrial truck driver (Tr. 30-50).

## III. SUMMARY OF MEDICAL EVIDENCE

Plaintiff alleged disability due to depression and back problems (Tr. 231, 259, 266).

On April 16, 2009, Plaintiff appeared alert and reported no psychiatric symptoms to the staff at St. Elizabeth Health Center ("SEHC") (Tr. 299).

One month later, on May 20, 2009, Plaintiff presented to Turning Point Counseling Services, Inc. ("Turning Point"), for treatment of his depressive symptoms (Tr. 382-85). He listed several stressors, including not seeing his daughter much (Tr. 382). On examination, Plaintiff had an average demeanor (Tr. 383). He cooperated (Tr. 384). He had a depressed mood, but a full affect (Tr. 384). Plaintiff reported no self-abuse or aggression (Tr. 383). He maintained a logical thought process (Tr. 383). He reported no impairment of orientation, attention, or concentration (Tr. 384). The Turning

Point staff assigned him a global assessment of functioning ("GAF") score of fifty (Tr. 384).

At his next appointment in June, Plaintiff informed the Turning Point staff that Cymbalta helped a little (Tr. 380). He reported no side effects (Tr. 380). On examination, Plaintiff had a pleasant demeanor (Tr. 380). Despite a depressed mood and a flat affect, Plaintiff had no suicidal or homicidal ideation, and no thought or perception deficits (Tr. 380). His behavior was appropriate (Tr. 380). He appeared alert and oriented (Tr. 380). He had fair insight and judgment (Tr. 380).

On September 29, 2009, Plaintiff returned to Turning Point after he had been out of medication for a while (Tr. 378). Cymbalta had helped, and he wanted to restart it (Tr. 378). On examination, he displayed a pleasant demeanor (Tr. 378). Although he had a depressed mood and a flat affect, Plaintiff possessed no suicidal or homicidal ideation, and no thought or perception deficits (Tr. 378). Plaintiff's non-compliance with medication showed poor insight and judgment (Tr. 378). Nonetheless, Plaintiff had appropriate behavior, and remained alert and oriented (Tr. 378).

The Turning Point staff observed these same objective findings at Plaintiff's next visit on October 27, 2009 (Tr. 376). On this occasion, however, Plaintiff's poor insight and judgment was evidenced by his drinking three days earlier (Tr. 376). Thereafter, in a December 1, 2009 visit to SEHC, Plaintiff described his depressive symptoms as controlled, and said he was "feeling better" (Tr. 307).

Subsequently, on June 28, 2010, eight months after his last visit, Plaintiff returned to Turning Point (Tr. 374-75). The staff noted his long absence (Tr. 374). Plaintiff said he had been staying with a friend for the past few months (Tr. 374). He reported depressive symptoms that included decreased energy/motivation and a tendency to isolate himself (Tr. 374). On examination, Plaintiff maintained a pleasant demeanor (Tr. 374). Despite a depressed mood and flat affect, Plaintiff had no suicidal or homicidal ideation, and no deficits in thought or perception (Tr. 374). His lack of compliance with

3

medications and appointments evidenced poor insight and judgment (Tr. 374). Nonetheless, Plaintiff behaved appropriately, and remained alert and oriented (Tr. 374). Six months later, on December 15, 2010, Turning Point discharged Plaintiff for his failure to return for treatment and missing numerous appointments (Tr. 372-73).

On January 5, 2011, Plaintiff underwent a consultative examination by John J. Brescia, M.A., a psychologist (Tr. 328-39). A friend drove him to the examination (Tr. 328). Plaintiff reported seeing his daughter occasionally, although he had not seen her in nine months (Tr. 328). He saw his siblings when he went to North Carolina; his youngest brother lived locally (Tr. 329). Plaintiff reported no psychiatric hospitalizations (Tr. 330). He had received outpatient treatment for about two and one-half years, but had no previous mental health treatment (Tr. 330).

As for his daily activities, Plaintiff reported living alone (he had previously stayed with a female friend) (Tr. 336). He occasionally rode the bus or walked in the park (Tr. 336). He primarily stayed home because he did not like to be around others (Tr. 336). A friend helped him clean (Tr. 336). She also did his laundry, sometimes took him to places that he needed to go, and did his major shopping (Plaintiff sometimes went to the store by himself) (Tr. 336). Plaintiff did not belong to any groups or clubs, and did not socialize much (Tr. 336). He had few friends (Tr. 336). He described the woman he used to live with as a friend (Tr. 336). Another friend was someone who he knew for a long time and had invited him for Christmas and New Year's Eve dinner (Tr. 336). Plaintiff seldom saw family members, and sometimes did not want to be bothered with them (Tr. 337).

On examination, Plaintiff cooperated and interacted appropriately (Tr. 333). He responded appropriately to questions (Tr. 332). Despite a rather drawn demeanor and a flat affect, he exhibited no unusual ideation (Tr. 332). Plaintiff stated, "I really ain't motivated at all" (Tr. 332). He reported sometimes becoming angry, which caused him to curse at people (Tr. 332). He had also been "nasty"

4

to his girlfriend (e.g., slapping her and starting fights) (Tr. 332). Plaintiff admitted to having been violent and having thought of harming others (Tr. 332-33). He had no plan or intention of actually hurting anyone (Tr. 333). He had previously thought of suicide, but never attempted it, and no longer entertained such a thought (Tr. 332). He further alleged that he experienced weekly crying spells that made him want to isolate himself (Tr. 333).

Additionally, Plaintiff exhibited an uncertain and somewhat guarded demeanor (Tr. 333). He sometimes thought people were against him or wanted to harm him (Tr. 334). He might feel that way about people who were supposed to be his friends (Tr. 334). He said he had trouble getting along with and relating to others (Tr. 334). They often did not see things the way he did, or they did not seem to understand him (Tr. 334). Plaintiff said he had "zero tolerance" (Tr. 335). He described his concentration as "shot" (Tr. 335). He had weak common sense reasoning (Tr. 335), and showed poor judgment at times (Tr. 335-36). Nevertheless, Plaintiff gave no indication of delusional thinking or a formal thought disorder (Tr. 334). He remained oriented, and showed no evidence of any clouding of consciousness or diminished alertness (Tr. 334).

Ultimately, Mr. Brescia concluded that Plaintiff had a GAF score of fifty-five (Tr. 337-38). He further opined that Plaintiff was moderately impaired in relating to others; understanding, remembering, and carrying out tasks (he could perform simple repetitive tasks); maintaining the attention, concentration, persistence, and pace to perform routine tasks; and withstanding the stress and pressures associated with day-to-day work activity (Tr. 338-39).

On January 12, 2011, Tonnie Hoyle, Psy.D., a state agency psychologist, observed that for severity and Listings purposes, Plaintiff had a mild restriction to his activities of daily living; moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation (Tr. 71, 85). Regarding Plaintiff's medical residual functional capacity,

5

Dr. Hoyle concluded that Plaintiff could perform simple routine tasks in a relatively static environment that required only brief and superficial contact with others, and did not have high production demands (Tr. 76, 90). Paul Tangeman, Ph.D., another state agency psychologist, agreed with Dr. Hoyle's findings on June 8, 2011 (Tr. 102, 107).

On January 14, 2011, Plaintiff underwent a consultative physical examination by Brenda Stringer, M.D. (Tr. 341-48). He had normal communication skills, but was not very forthcoming or completely cooperative (Tr. 343). Nevertheless, Dr. Stringer observed that Plaintiff's "mental status was normal today without any overt signs of anxiety or depression" (Tr. 344).

Thereafter, on March 11, 2011, Plaintiff returned to Turning Point (Tr. 358). He was depressed, but had been off his medication for three to four months (Tr. 359). He reported a good relationship with two of his brothers (Tr. 359). He had friends, but had not seen them due to the weather (Tr. 360). Plaintiff said that he cursed when angry, but denied any oppositional behaviors (Tr. 365). He further reported poor focus, no patience, and difficulty concentrating (Tr. 365). On examination, Plaintiff alleged auditory hallucinations and delusions of persecution (Tr. 371). He displayed a depressed mood and flat affect (Tr. 371). Nonetheless, Plaintiff had no plan to commit suicide or harm others (Tr. 370). He had a positive/helpful relationship with significant others (Tr. 370). The Turning Point staff assigned him a GAF score of fifty-five (Tr. 368).

Nine months later, on December 13, 2011, Plaintiff returned to Turning Point (Tr. 412-18). He reported previously taking Seroquel XR, Cymbalta, and Ambien (Tr. 413). The first two medications provided no benefit, but Ambien helped (Tr. 414). Plaintiff further alleged that his depression caused him to isolate himself, among other things (Tr. 416). He lived alone, but had a good relationship with his daughter (Tr. 413). On examination, Plaintiff reported being no risk to himself or others (Tr. 418). He was isolated, but had an accessible and somewhat helpful relationship

with others (Tr. 418). The staff assessed him as a low risk to himself, and no risk to others (Tr. 418). They assigned him a GAF score of fifty-five (Tr. 420).

The following month, on January 18, 2012, Plaintiff informed the Turning Point staff that he had never had many friends (Tr. 406). He repeated that his symptoms caused him to isolate himself (Tr. 410). On examination, Plaintiff reported no delusions, aggression, or self-abuse (Tr. 419). He had no hallucinations, and maintained a logical thought process (Tr. 419). Despite a depressed, anxious, and irritable mood, Plaintiff maintained a full affect (Tr. 419). He was also cooperative (Tr. 419).

Thereafter, Plaintiff returned to Turning Point on three more occasions in 2012 – February 17 (Tr. 399), March 13 (Tr. 398, 402-05), and April 25 (Tr. 397, 400-01). On March 13, Plaintiff had a subdued mood, but appropriate affect (Tr. 399). He felt down, which was why he had missed so many appointments (Tr. 399). He acknowledged that his tendency to isolate himself was self-defeating, but he lacked the energy or motivation to change it (Tr. 399). For example, he was not motivated to visit his daughter (Tr. 399).

On March 13, Plaintiff said he was paranoid to go into a group of people (Tr. 402). He had varying moods and affects (Tr. 398, 404). Despite having no energy and finding little pleasure (Tr. 398), he "was able to see how [a] visit with [a] friend helped elevate [his] mood" (Tr. 398). On examination, he had an average demeanor (Tr. 403). He reported no hallucinations, or suicidal or homicidal ideation (Tr. 403). His thought process remained logical (Tr. 403). He was cooperative (Tr. 404). He had no deficits in orientation, attention, or concentration (Tr. 404). He displayed adequate insight and judgment (Tr. 404). The Turning Point staff assessed him with a GAF score of fifty (Tr. 404).

Finally, on April 25, Plaintiff reported a negative reaction to a medication (Tr. 397). Irritability was a primary concern, and caused him to socialize less (Tr. 397). His energy and motivation levels were also low (Tr. 397). A friend had encouraged him to walk in the park, but he had no interest in doing so (Tr. 397). On examination, Plaintiff had a logical and coherent thought process (Tr. 400). He had no deficits in thought content or perception (Tr. 400). Despite a less than optimal mood/affect, and poor insight and judgment, Plaintiff denied any suicidal or homicidal ideation (Tr. 400).

### IV.  SUMMARY OF TESTIMONY

Plaintiff testified that his alleged depressive symptoms included crying spells and paranoia (Tr. 40). The daily feelings of paranoia caused him not to want to be around people (Tr. 40-41). It was not that he disliked people, he just liked to be by himself (Tr. 44). He had to get very motivated to be around others (Tr. 42). He wanted to be alone most of the time (Tr. 44). Plaintiff sometimes conversed with neighbors, but did not socialize with them (Tr. 43). His brother also visited once in a while (Tr. 41). Plaintiff reported no longer having many friends (Tr. 40). He did have one friend that helped him care for his apartment and went grocery shopping for him (Tr. 41-42). A friend also encouraged him to seek treatment at Turning Point (Tr. 45). Plaintiff asserted that he felt the same since undergoing that treatment (Tr. 45). He also stated that he cooperated with the Turning Point staff, and showed up for his appointments (Tr. 46).

After Plaintiff testified, the ALJ received testimony from a vocational expert ("VE") (Tr. 50-55). The ALJ asked the VE whether occupations existed for someone of Plaintiff's age, education, work experience, and the residual functional capacity ("RFC") to perform light work that involved simple routine tasks that did not require arbitration, negotiation, confrontation, directing the work of

others, or being responsible for the safety or welfare of others; no strict production quotas; no piece rate or assembly line work; and only superficial interaction with others (Tr. 52). The VE answered affirmatively, and identified the light, unskilled jobs of cleaner/housekeeper, inspector, and hand packager (Tr. 52-53). The ALJ then asked whether occupations existed if the additional limitations of being off-task thirty-three percent of the workday and an inability to sustain even occasional and superficial interaction with others were added (Tr. 53). The VE answered in the negative (Tr. 53-54).

## V.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (Sections 20 C.F.R. 404.1520(b) and 416.920(b) (1992);

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (Sections 20 C.F.R. 404.1520(c)and 416.920(c)(1992);

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* Sections 20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in Sections20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (Sections 20 C.F.R. 404.1520(d) and 416.920(d) (1992);

4.  If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (Sections 20 C.F.R. 404.1520(e) and 416.920(e) (1992);

5.  If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (Sections 20 C.F.R. 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan,* 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990).

### VI.   STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by Section 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. Section 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See, Abbott v. Sullivan,* 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the ALJ's decision, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Social Security,* 127 F.3d 525., 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales,* 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, id., Walters,* 127 F.3d 525, 532 (6th Cir. 1997). Substantiality is based upon the record taken as a whole. *See, Houston v. Secretary of Health and Human Servs.,* 736 F.2d 365 (6th Cir. 1984).

## **VII.  ALJ'S DECISION**

After considering the record evidence, the ALJ classified Plaintiff's degenerative disc disease, depression, personality disorder, and substance abuse in apparent early remission as severe impairments (Tr. 12).  Plaintiff's impairments did not meet or medically equal a Listing (Tr. 12).  He did, however, limit Plaintiff to light work, which involved simple routine tasks that did not require arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety or welfare of others; no strict production quotas; no piece rate or assembly line work; and only superficial interaction with others (Tr. 14).  As such, while Plaintiff could not perform his past relevant work (Tr. 18), he could perform the representative occupations of cleaner/housekeeper, inspector, and hand packager (Tr. 19).  Therefore, the ALJ decided that Plaintiff did not meet the ALJ's definition of disability during the relevant time period (Tr. 20).

## **VIII.  ANALYSIS**

The legal issue raised by Plaintiff before the Court questions whether the Record supports the hypotheticals, as posed by the ALJ to the VE.

> "Q. Mr. Breslin, for hypothetical number two if we take all of those limitations but add the limitation that the individual would be off task thirty-three percent of the time secondary to emotional symptoms, any jobs for that person?
>
> A. No, sir.  That would be – somebody who was off task for that period of time during the work day wouldn't be sufficiently productive to maintain employment.  They would lose their job.
>
> Q.. All right, and for hypothetical number three, if we return to hypothetical number one, but add a limitation that the individual is unable to sustain even occasional and superficial interaction in a work place setting on an ongoing basis, any jobs for that person?
>
> A. No, sir.  I think virtually any unskilled job would require some

11

>       interaction at the very least with supervisors, but normally some
>       incidental or casual interaction with coworkers as well." (Tr. 53-54).

In addition, the Plaintiff disputes whether the ALJ applied the correct law and whether he relied on substantial evidence to find that Plaintiff did not meet the Act's definition of disability during the relevant period. However, the ALJ correctly determined that Plaintiff did not require work that permitted him to be off-task thirty-three percent of the workday (Tr. 14, 53). Similarly, the ALJ also correctly found that Plaintiff could perform work that involved only superficial interaction with others (Tr. 14, 52). During the relevant period, healthcare personnel collectively found Plaintiff to behave cooperatively or appropriately (Tr. 332, 378, 380, 384, 404, 419), have an average to pleasant demeanor (Tr. 374, 378, 380, 383, 403), and maintain a logical thought process (Tr. 383, 400, 403, 419). Plaintiff also often had no deficits in perception or thought (Tr. 374, 378, 380, 400, 419). He repeatedly reported no suicidal or homicidal thought (Tr. 370, 374, 378, 380, 383, 400, 403). He noted no impairment of attention or concentration (Tr. 384, 404). Furthermore, Plaintiff appeared alert and/or oriented (Tr. 299, 334, 374, 378, 380). He identified as positive and helpful (Tr. 370), or accessible and somewhat helpful relationship with significant others (Tr. 418). Dr. Stringer observed that Plaintiff's "mental status was normal today without any overt signs of anxiety or depression" (Tr. 344).

In addition to these objective findings, on April 16, 2009, Plaintiff reported no psychiatric symptoms (Tr. 299). On December 1, 2009, he said that his depressive symptoms were controlled, and that he was "feeling better" (Tr. 307). On June 28, 2010, Plaintiff reported that he had been staying with a friend for the past few months (Tr. 374). Six months later, on January 5, 2011, Plaintiff informed the consultative psychological examiner that he had no psychiatric hospitalizations (Tr. 330). He acknowledged that he occasionally rode the bus or walked in the park (Tr. 336). He further

admitted that a friend helped him clean his apartment and launder his clothes, took him places, and performed major shopping duties (Tr. 336). Thereafter, on March 11, 2011, Plaintiff stated that he had a good relationship with two of his brothers (Tr. 359). Although he had not seen them due to the weather, Plaintiff also reported having friends (Tr. 360). Nine months later, on December 13, 2011, Plaintiff noted a good relationship with his daughter (Tr. 413).

Plaintiff reported to the state agency that he sometimes took a walk or rode the bus alone (Tr. 249, 251). He also shopped in stores once per month for two-and-a-half hours (Tr. 251). The SSA employee who assisted him with his applications described him as cooperative, and observed him to have no difficulty concentrating, understanding, being coherent, talking, or answering (Tr. 220). At the administrative hearing, Plaintiff reported having a friend that helped him care for his apartment and went grocery shopping for him (Tr. 41-42). He further noted that his brother visited once in a while (Tr. 41). Plaintiff also sometimes conversed with neighbors (Tr. 43). Furthermore, it was a friend who had encouraged him to seek treatment at Turning Point (Tr. 45). Plaintiff's attendance at Turning Point was intermittent (Tr. 372-74).

In addition, both state agency psychologists determined that Plaintiff maintained the mental residual functional capacity to perform simple routine tasks in a relatively static environment that required only brief and superficial contact with others and did not have high production demands (Tr. 76, 90, 107). Finally, the ALJ correctly accounted for any limitations that Plaitniff had in being off-task and in interacting with others by limiting him to light work that involved simple routine tasks that did not require arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety or welfare of others; no strict production quotas; no piece rate or assembly line work; and only superficial interaction with others (Tr. 14, 52).

In conclusion, the Court finds that the ALJ correctly assessed Plaintiff's RFC without including the additional limitations of being off-task thirty-three percent of the workday and not even

13

occasional or superficial interaction with others.

## IX. CONCLUSION

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform a full range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), and, therefore, he was not disabled. Hence, he is not entitled to DIB and SSI.

Dated: April 9, 2014                                     */s/George J. Limbert*
                                                                        GEORGE J. LIMBERT
                                                                        UNITED STATES MAGISTRATE JUDGE